IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KRISTA R. CARR, | ) | CASE NO. 5:16CV2247 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | MAGISTRATE JUDGE |
| | ) | KATHLEEN B. BURKE |
| COMMISSIONER OF SOCIAL | ) | |
| SECURITY ADMINISTRATION, | ) | |
| | ) | **MEMORANDUM OPINION & ORDER** |
| Defendant. | ) | |

Plaintiff Krista Carr ("Carr") seeks judicial review of the final decision of Defendant Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). Doc. 1. This Court has jurisdiction pursuant to 42 U.S.C. § 405(g). This case is before the undersigned Magistrate Judge pursuant to the consent of the parties. Doc. 13.

For the reasons stated below, the decision of the Commissioner is **AFFIRMED**.

## I. Procedural History

Carr filed applications for DIB and SSI on October 15, 2013, alleging a disability onset date of September 1, 2013. Tr. 19, 187, 194. She alleged disability based on the following: Crohn's Disease and stomach pain. Tr. 228. After denials by the state agency initially (Tr. 86, 87) and on reconsideration (Tr. 106, 107), Carr requested an administrative hearing. Tr. 140. A hearing was held before Administrative Law Judge ("ALJ") Tracey B. Leibowitz on August 4, 2015. Tr. 38-68. In her August 7, 2015, decision (Tr. 19-31), the ALJ determined that there are jobs that exist in significant numbers in the national economy that Carr can perform, i.e., she is not disabled. Tr. 30. Carr requested review of the ALJ's decision by the Appeals Council (Tr.

14) and, on August 9, 2016, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Carr was born in 1989 and was 24 years old on the date her applications were filed. Tr. 29, 194. She graduated from high school, obtained State Tested Nurse Aide status, and previously worked as a mental retardation aide. Tr. 45, 47-48, 65, 229.

### B. Medical Evidence

In September 2011, Carr underwent exploratory surgery as a result of a history of abdominal discomfort, nausea, vomiting, and some loose stool; multiple emergency room visits; and a possible bowel obstruction. Tr. 276. Gastroenterologist Mona Shay, D.O., saw Carr and discussed with her that the surgery revealed a small bowel obstruction and inflammatory changes that suggest Crohn's disease. Tr. 276-277. Dr. Shay discussed the importance of medication compliance and follow-up. Tr. 277.

In January 2013, Carr was living in West Virginia and saw Michael Roberts, M.D., because she had a retained capsule that she had never passed after an endoscopy performed for her Crohn's disease. Tr. 300. The capsule was in Carr's distal ileum, where there was a twist. Tr. 300. She reported that she was taking Remicade for her Crohn's and described intermittent obstructive symptoms that were not severe at that time. Tr. 300. Dr. Roberts noted that Carr had a history of colon resection surgery and recommended another resection surgery after further diagnostic testing. Tr. 300, 302.

Dr. Roberts performed surgery on February 26, 2013 (Tr. 1037-1038) and, in April 2013, opined that Carr had recovered post-operatively and had no work restrictions. Tr. 1019-1020.

Carr was not restarted on Remicade. Tr. 323. In March 2013 a CT of her gallbladder showed a poorly distended gallbladder with the wall appearing to be concerning for inflammation and acalculus cholecystitis. Tr. 1024-1025.

Thereafter, Carr moved back to Ohio. She had three hospital visits in July 2013. At the first she reported pain, nausea, vomiting and diarrhea. Tr. 562. A CT scan was normal. Tr. 323. She was discharged with pain medication. Tr. 564. At the second, she reported pain and vomiting since the night before. Tr. 541. A CT scan showed inflammation of the distal ileum. Tr. 544, 323. She was discharged with pain medication. Tr. 753. At the third, she reported pain, nausea and vomiting. Tr. 487. She stated that she had just moved to the area and had not been taking Remicade. Tr. 487. She last took it in November 2012. Tr. 589. She was admitted, placed on antibiotics, and was seen by Edward Schirack, D.O., an associate of Dr. Shay's, for a gastroenterology consultation. Tr. 323, 312. Dr. Schirack noted that Carr had been working and that she had not been receiving medical therapy for her Crohn's. Tr. 312. He explained that the type of Crohn's that Carr had tended to require ongoing therapy, and Carr reported that she has recurrences "almost immediately when stopping medications." Tr. 312. A colonoscopy showed a normal colon and mild inflammatory changes in her ileum. Tr. 323. Dr. Schirack started her on medication, including prednisone. Tr. 323.

At a follow up visit with Dr. Schirack in early August she reported six loose bowel movements a day, intermittent vomiting, and constant abdominal pain. Tr. 323. She reported that her abdominal pain was the type she had previously experienced and that Remicade had helped. Tr. 323. Dr. Schirack adjusted Carr's medication and began preclearance for Remicade. Tr. 325. Carr reported no weight loss. Tr. 323. She weighed 227 pounds. Tr. 323.

On September 6, 2013, Carr saw Dr. Schirack after having been hospitalized the previous day for pain, nausea and vomiting. Tr. 319, 611. Dr. Schirack observed that Carr's "history has been difficult as she has had these episodes of nausea, vomiting and ... pain which have not really been correlating with disease activity of Crohn disease." Tr. 318. He noted that her recent small bowel x-ray and CT scans had been normal. Tr. 318. He adjusted her medications, continued her Remicade, and recommended a referral to pain management for her complaints of abdominal pain to prevent recurrent hospitalizations. Tr. 320.

On September 11, 2013, Carr went to the hospital for her Remicade infusion and was transferred to the emergency room because of headache and vomiting. Tr. 996. A drug screen came back positive for cannabinoids. Tr. 996.

On September 16, 2013, Carr had a follow-up visit with Dr. Shay. Tr. 326. Carr had been hospitalized the previous week. Tr. 326. Dr. Shay remarked, "[Carr's] history seems to vary depending on where she is being evaluated." Tr. 326. She noted Carr's recent emergency room visits and her normal recent diagnostic tests results. Tr. 326, 328. Carr reported to Dr. Shay that she had had a reaction to her Remicade infusion. Tr. 326. Dr. Shay had multiple conversations with nursing staff and Dr. Schirack, reviewed Carr's history, and stated, "There is some concern with pain medication seeking behavior." Tr. 328. Carr's medications were adjusted and an ultrasound ordered. Tr. 328. Dr. Shay also discussed with Carr the need to avoid emergency room visits to assist with the continuity of care. Tr. 328. Carr was to return for a follow up visit in three weeks. Tr. 328. Dr. Shay requested insurance authorization for Humira based on Carr's stated reaction to the Remicade. Tr. 328.

On September 29, 2013, Carr went to the emergency room for abdominal pain, nausea, vomiting and watery stools. Tr. 334. Her symptoms were noted to be similar to those at her

4

previous emergency room visits. Tr. 334. Carr reported that her gastroenterologist indicated that her Crohn's was in remission. Tr. 334. She was reminded of the importance of managing her chronic pain with her gastroenterologist to ensure continuity of care. Tr. 338. She received pain medication upon discharge. Tr. 338.

The next day Carr drove herself to a different hospital emergency room complaining of abdominal pain, nausea and vomiting. Tr. 937. The treatment notes indicate that she had been to other emergency rooms but that tests have been negative. Tr. 937. Carr reported that the onset of her symptoms had been gradual and her associated symptoms were "occasional" vomiting. Tr. 938. She was diagnosed with chest wall pain and discharged with pain medication. Tr. 939-940.

Carr continued to seek treatment through various hospital emergency departments. See, e.g., Tr. 344, 916, 1042, 1084, 1134, 1103. At an October 2013 visit, she was diagnosed with "chronic pain w/ narcotic dependency and inappropriate narcotic seeking behavior." Tr. 899. She was encouraged to be compliant and to establish pain management care. Tr. 899.

Carr stopped seeing Dr. Schirack and started seeing Frank D. Lazzerini, M.D, as her primary care physician. Tr. 1134. An abdominal CT scan in early December 2013 showed no evidence of active Crohn's disease or bowel obstruction, post-surgical changes, and a small bowel hernia that had not changed since the last examination. Tr. 1106. Dr. Lazzerini referred Carr to gastroenterologist Ghulam Mir, M.D., who started Carr on Humira in January 2014. Tr. 1146, 1148. On March 11, Carr stated that the Humira was helping. Tr. 1073. At the time she reported abdominal pain, diarrhea, nausea and vomiting. Tr. 1073. On March 29, she went to the emergency room and a CT scan showed two areas of narrowing in the sigmoid colon which

could relate to contractions or strictures, no obstruction, and fluid in her colon consistent with mild colitis. Tr. 1100.

In April she reported constant nausea without vomiting, diarrhea up to 8 times a day, and blood in her stool one week prior. Tr. 1143. In May 2014, an abdominal and chest x-ray was unremarkable (Tr. 1217) and a colonoscopy revealed ulceration in the terminal ileum compatible with Crohn's disease. Tr. 1213.

On June 18, 2014, Carr went to the hospital for severe abdominal pain. Tr. 1299. She was seen for a gastroenterologist consultation with Essam Quraishi, M.D. Tr. 1301. Dr. Quraishi observed, "Patient has been in the hospital multiple times in the last month with complaints of abdominal pain." Tr. 1301. She was currently on Humira. Tr. 1301. Dr. Quraishi observed that "the last few admission[s] there was no obvious evidence of severe Crohn's noted." Tr. 1301. Her last CT scan was 1 ½ weeks prior and was not consistent with severe Crohn's exacerbation. Tr. 1301. Dr. Quraishi continued, "The patient has been on high dose narcotic medications and continues to get those." Tr. 1301. He found no convincing evidence of Crohn's, did not repeat a CT scan based on her past multiple CT scans, and recommended no medication from a gastrointestinal standpoint. Tr. 1302. Carr was "very upset" that she was not getting pain medications. Tr. 1302. Two days prior to seeing Dr. Quraishi, she had gotten a 120-count prescription for Percocet from Dr. Lazzerini. Tr. 1168.

On July 17, 2014, Carr saw Dr. Mir and reported nausea every couple of days, vomiting 2-3 times per week, and diarrhea 6-7 times a day. Tr. 1213. Dr. Mir's impression was "Crohn's disease, on relapse, on Humira." Tr. 1215.

Carr saw Dr. Mir in August 2014 and had no GI complaints. Tr. 1209. She still had abdominal pain, was on Humira, and was having 3-4 bowel movements a day. Tr. 1209. A CT

6

scan on September 16 showed a small bowel obstruction in Carr's mid to lower right abdomen. Tr. 1289. An x-ray on September 17 showed no evidence of bowel obstruction and that the previously noted dilated loops of small bowel had resolved. Tr. 1276.

On October 11, 2014, Carr went to the emergency room for nausea, vomiting and abdominal pain. Tr. 1252. A CT scan showed short segment bowel dilation with wall thickening, which may be related to active Crohn's, and potential focal ileus that warranted continued surveillance to document whether it resolved or progressed. Tr. 1254. In November 2014, Carr underwent a surgical intervention for an incisional hernia and strictures from Crohn's disease, including a small bowel resection. Tr. 1228-1229. Six inches of bowel were removed and her hernia was repaired. Tr. 1228.

In March 2015 Carr complained to Dr. Mir of nausea and vomiting every other day or every day, abdominal pain, and diarrhea approximately eight times a day for the past "couple weeks." Tr. 1401. She weighed 229 pounds. Tr. 1402.

In all, Carr had about 30 hospital visits in two years.

### C. Medical Opinion Evidence

#### 1. Treating Source

In November 2013, Dr. Schirack filled out an assessment form, wherein he stated that he last saw Carr in September 2013; she had not been compliant with office visits and was not returning phone calls; and she had not started the Humira as recommended. Tr. 1001-1002, 1017. Dr. Schirack left blank the section asking what, if any, limitations Carr would have performing work-related activities due to her impairments. Tr. 1002.

#### 2. State Agency Reviewers

7

In January 2014, state agency physician Steve McKee, M.D., reviewed Carr's record. Tr. 76. He opined that Carr's impairments (Crohn's disease and stomach pain) were non-severe. Tr. 75-76.

In April 2014, state agency physician Elizabeth Das, M.D., reviewed Carr's record. Tr. 88. Dr. Das opined that Carr's impairments (Crohn's disease, stomach pain, obesity) were severe. 91. Regarding Carr's residual functional capacity (RFC), Dr. Das opined that Carr could perform light work, including the ability to lift or carry 20 pounds occasionally and 10 pounds frequently, sit about six hours in an eight-hour workday, and stand and/or walk about six hours in an eight-hour workday. Tr. 93. She could occasionally climb ramps/stairs and ladders/ropes/scaffolds, stoop, crouch, crawl, and frequently balance. Tr. 93. Dr. Das observed that Carr's Crohn's disease was in remission, she had no weight loss, and her symptoms did not correlate with Crohn's disease. Tr. 93-94.

### D. Testimonial Evidence

#### 1. Carr's Testimony

Carr was represented by counsel and testified at the administrative hearing. Tr. 40-63. She testified that she lives in a house with her five-year old son. Tr. 44. At the time of her hearing, she weighed about 208 pounds. Tr. 44. She had lost a lot of weight in the past year because of vomiting and not eating for days and weeks at a time. Tr. 44-45. She usually weighed about 230 pounds but it fluctuates depending on how sick she is. Tr. 45. She drives a car and drove herself to the hearing; it took her a half hour. Tr. 45. She drives when she has to go somewhere, like when her son has school. Tr. 45. She last drove "the other day" to take her son to the doctor to get shots for school. Tr. 45.

Carr previously worked as a nurse's aide at a nursing home. Tr. 47. She worked there for just under three months and was fired because she kept calling off work. Tr. 47. When asked why she believed that she could not work, Carr stated that she will have days where she is okay for 3-4 days, but then she becomes symptomatic "and I'll be down and be like useless for like a week" and hopefully does not end up in the hospital. Tr. 49. Quite often she is not able to control her symptoms with her medicine. Tr. 49. She described it as a constant game of chance of how she's going to feel and whether she will be able to do anything in the morning when she wakes up. Tr. 49. The day of the hearing, her pain level was at a 5 out of 10 and her pain is all day; it is rare that her stomach does not hurt or she does not feel nauseous. Tr. 50.

On a good day, Carr gets up, makes her son breakfast, and takes care of him. Tr. 51. On a day that she is sick, "everything gets put on hold." Tr. 51. She has to drive to pick up her mother, who is not mobile, and bring her to Carr's house to take care of Carr's son. Tr. 51. She "pretty much live[s] in the bathroom, sitting on the toilet with my head in a bucket probably for the next good four or five hours." Tr. 51. This happens about 2-3 times a month or every other week. Tr. 51. Nothing triggers it, although she gets injections every other week, on Fridays, and as it gets closer to that time it starts to get worse. Tr. 51. After she gets her injections, it takes a while to kick in; she does not have instant relief. Tr. 59. Good days last for about five days before she can feel the medication starting to wear off. Tr. 59.

When the ALJ asked whether she feels that her doctors are helping her, Carr responded that she has been through a lot of them, and that, right now, "I wouldn't say it's under control, but it's I guess better than it's been in the last few years. But it's still definitely not under control." Tr. 54. She still considers that it is severe because she still has days constantly, multiple times a month, where her condition flares up and she is vomiting all day and "pretty

9

much living in my bathroom." Tr. 54. The last emergency room visit she had was about one month prior. Tr. 55. She had to go to the emergency room because she could not keep anything down; when that happens, there is nothing else that she can do and she has to go to the hospital. Tr. 55. She takes medication for her Crohn's, nausea, and stomach cramping. Tr. 55. Smoking and drinking make it worse, and she does neither; she also does not do drugs like marijuana. Tr. 56.

The day of the hearing, Carr stated that she was not having a good day. Tr. 56. She had been "kind of" sick for the last couple of days and was lucky that she got to the hearing. Tr. 56. Her attorney asked her whether, if she was having a "really bad day," when she was having to go to the bathroom and vomit, it would have been impossible for her to come to the hearing, and she answered that it definitely would have been impossible. Tr. 56. The last time she was sick and vomiting in the bathroom throughout the day was "probably Saturday." Tr. 57.

Carr last had surgery in 2014, when a portion of her bowel was removed because it was obstructed. Tr. 60. She feels better than she had before as a result. Tr. 60. But she does not think her symptoms are even slightly better since then; they are still not under control. Tr. 60. She relayed that her doctor told her that, by the time she is 40, she will probably have no more intestine left because it is just eating away at itself and she will have to have a colostomy bag "probably most likely, at the rate that it's going." Tr. 60. Some Crohn's patients can manage their symptoms but Carr's are not manageable. Tr. 61. She has been on different kinds of infusions, which did not work at all, and then they had to be stopped because she became allergic to them. Tr. 61. Her current medication is doing okay but just slowing the Crohn's down, it's not stopping it. Tr. 61. Her Crohn's doesn't go into remission. Tr. 61. When she feels like she

is about to have a flare up, she tries to take her Phenergan, if she can keep it down, and she also avoids eating certain things like greasy foods.  Tr. 62.

### 2. Vocational Expert's Testimony

Vocational Expert Barbara Burke ("VE") testified at the hearing.  Tr. 64-68.  The ALJ discussed with the VE Carr's past relevant work as a mental retardation aide.  Tr. 65-66.  The ALJ asked the VE to determine whether a hypothetical individual with Carr's age, education and work experience could perform her past work if that person had the following characteristics: can lift 20 pounds occasionally and 10 pounds frequently; can stand and/or walk about 6 hours in an 8-hour workday and sit for up to 6 hours in an 8-hour workday with normal breaks; can occasionally climb ladders, ropes or scaffolds and climb ramps and stairs; can frequently balance; and can occasionally stoop, crouch and crawl.  Tr. 66.  Tr. 66.  The VE testified that such a person could not perform Carr's past work.  Tr. 66.  The ALJ asked the VE if there are other jobs that the person could perform, and the VE testified that the person could perform jobs as a housekeeping cleaner (140,000 national jobs), cashier (540,000 national jobs), and fast food worker (1,180,000 national jobs).  Tr. 66-67.

Next, the ALJ asked the VE if there would be jobs the hypothetical individual could perform if that individual would need, in addition to normal work breaks, two to three bathroom breaks per day lasting five minutes per break.  Tr. 67.  The VE responded that there would be no jobs that such an individual could perform.  Tr. 67.  The ALJ asked if the VE's answer would change if the individual's bathroom breaks lasted three minutes rather than five minutes, and the VE replied that it would not.  Tr. 67.

Carr's attorney asked the VE whether the hypothetical individual described by the ALJ could perform work if the additional bathroom breaks described were not needed every day, but

11

were needed two to three times per month, and the amount of time each break lasted would be periodic and unpredictable, e.g., sometimes the break would last three minutes, sometimes ten minutes, and sometimes there would be an extra seven or eight breaks per day. Tr. 67-68. The VE answered that such an individual would not be able to sustain work on an ongoing basis. Tr. 68.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[1] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to establish whether the claimant has the vocational factors to perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In her August 7, 2015, decision, the ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2016. Tr. 21.

2. The claimant has not engaged in substantial gainful activity since September 1, 2013, the alleged onset date. Tr. 21.

3. The claimant has the following severe impairments: Crohn's/inflammatory bowel disease, status post 3 surgical resection procedures, and obesity. Tr. 21.

4. The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. Tr. 22.

---

[1] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 et seq. The analogous SSI regulations are found at 20 C.F.R. § 416.901 et seq., corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

5. The claimant has the residual functional capacity to perform light work as defined in 20 C.F.R. §404.1567(b) and 416.967(b), but she is limited to the frequent performance of tasks requiring balance, and she can no more than occasionally stoop, crouch, crawl, and/or climb ladders, ropes, scaffolds, ramps and stairs. Tr. 22.

6. The claimant is unable to perform any past relevant work. Tr. 29.

7. The claimant was born on June 15, 1989 and was 24 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date. Tr. 29.

8. The claimant has at least a high school education and is able to communicate in English. Tr. 29.

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills. Tr. 30.

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform. Tr. 30.

11. The claimant has not been under a disability, as defined in the Social Security Act, from September 1, 2013, through the date of this decision. Tr. 30.

## V. Parties' Arguments

Carr objects to the ALJ's decision on two grounds. She asserts that the ALJ erred when she failed to include the need for restroom breaks in her RFC assessment and when she considered Carr's credibility. Doc. 14, pp. 13-23. In response, the Commissioner submits that the ALJ's determinations with respect to Carr's RFC and credibility are supported by substantial evidence. Doc. 16, pp. 9-16.

Discussion of Carr's argument pertaining to her restroom breaks necessitates discussion of the ALJ's assessment of Carr's credibility. Thus, the Court considers both of Carr's arguments together.

## VI. Law & Analysis

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health and Human Servs.,* 889 F.2d 679, 681 (6th Cir.1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

Carr argues that the ALJ failed to "validly articulate" why the need for restroom breaks was left out of her RFC assessment. Doc. 14, p. 13. She states, "The need for additional restroom breaks during the day is the crux of this case" because multiple places in the record show that Carr complained of pain and excessive vomiting and diarrhea. Doc. 14, p. 14. She asserts that the ALJ's decision "does not address this issue at all." Id.

Although it is correct to say that that ALJ did not specifically state why she was not including a restriction for additional restroom breaks in her RFC assessment, it cannot be said that the ALJ did not address the issue "at all." As described below, the ALJ gave a detailed account of the evidence and explained that she did not find Carr's allegations describing the extent of her limitations to be credible. In other words, the need for additional bathroom breaks is based primarily on Carr's subjective complaints, which the ALJ did not find convincing.

The ALJ spent a page detailing Carr's testimony. Tr. 24. She concluded that Carr is "not particularly limited on a 'good day'[] and that [her] 'bad day' symptoms are not as severe as she asserts." Tr. 24. Carr had testified that on "bad days" "everything stops" and she is unable to do anything and is in the bathroom all day. Tr. 24. She also stated that, the day of the hearing, she was not having a good day. Tr. 56. The ALJ accurately observed that, despite not having a good day, Carr had driven herself to the hearing (30 minutes, without stating that she had to stop along the way), sat during the 30-minute hearing, and appeared appropriately dressed, groomed and composed. Tr. 24. Carr argues that the ALJ's observation of her behavior at the hearing has been characterized by the Sixth Circuit as the "sit and squirm" test and has been rejected. Doc. 14, p. 17 (citing *Martin v. Sec'y of Health & Human Servs.*, 735 F.2d 1008, 1010 (6th Cir. 1984)). *Martin* is inapplicable because it concerns a situation where the ALJ rejected the claimant's complaints of pain *solely* on the basis of her own observations of the claimant at the hearing. 735 F.2d at 1010. Here, the ALJ did not reject Carr's complaints solely on the basis of the ALJ's observations at the hearing.

Specifically, the ALJ explained that, in September 2011, Carr lived in Ohio and had exploratory surgery, saw gastroenterologist Dr. Shay, and was diagnosed with Crohn's disease. Tr. 25. Carr then moved to West Virginia, was on Remicade, and her symptoms were not severe. Tr. 25. In early 2013, she had a retained endoscopy capsule that required surgery to resolve, which she elected to put off until after she obtained her imminent STNA certification. Tr. 25. Post-surgery, she denied complaints and her treating physician, Dr. Roberts, assessed her with no work restrictions. Tr. 25. Carr moved back to Ohio, did not establish care, and was working as an STNA. Tr. 25. In July 2013 she began a pattern of frequent emergency room visits, underwent diagnostic testing that was mostly normal, and was repeatedly discharged on pain

medication. Tr. 25-26. She eventually did see a specialist, Dr. Schirack, who noted that Carr had relatively minimal diagnostic findings and instructed Carr that patients with her type of Crohn's disease tend to require ongoing therapy. Tr. 26. Carr resumed her emergency room visits and had inconsistent complaints (e.g., "moderate" pain rated as 10/10 and appearing in no acute distress (Tr. 468, 462, 463)). Tr. 26. After further emergency room visits and the acquisition of pain medication, she saw Dr. Schirack again. Tr. 26. Dr. Schirack noted that Carr's pain did not correlate with Crohn's disease and that she reported being on morphine pain patches while living in West Virginia; remarked that her updated imaging studies were negative; and referred Carr to pain management to prevent further recurrent hospitalizations. Tr. 26-27. Carr had three more hospitalizations, updated unremarkable imagings, and a positive drug screen for cannabinoids. Tr. 27. Dr. Schirack documented his concern that Carr was exhibiting drug seeking behavior and advised Carr to follow up with him and avoid the emergency room so that she could maintain continuity of care. Tr. 27. Carr did not return to Dr. Schirack and instead went back to the emergency room, stated that her gastroenterologist told her that her Crohn's was in remission, and asked for Dilaudid because morphine made her ill. Tr. 27. She reported that her pain was a 10 but she had walked to the emergency room. Tr. 27. The next day she drove herself to a different emergency room and received a morphine injection, without apparent illness, as well as other pain medication. Tr. 28. A week later she was back in the emergency room and was diagnosed with narcotic dependency; three days later she presented to a different emergency room, and nine days after that, a *third* emergency room. Tr. 28. Eventually, she started treating with Dr. Mir, who started her on Humira. Tr. 28. June 2014 found her again in an emergency room with a staff concern for the use of high dose narcotics when GI evidence did not warrant it. Tr. 28. Despite her monthly Percocet refills (120 pills) from Dr. Lazzerini, her

17

primary care physician, her drug screen was negative for opiates and she continued to receive monthly Percocet refills from Dr. Lazzerini. Tr. 28, 1172, 1170, 1168, 1158, 1156, 1154. Carr had resection and repair surgery in December 2014. Tr. 28-29.

The ALJ commented that no treating physician provided an opinion that Carr's impairment caused any work related limitations; in fact, Dr. Roberts had stated that she had no limitations, Dr. Schirack declined to offer an opinion on the issue, and an emergency room provider indicated that she could return to work a few days after discharge. Tr. 27, 29. The ALJ relied upon the state agency reviewer's opinion that Carr could perform light work. Tr. 29. In sum, the ALJ explained why, in addition to Carr's hearing testimony, she did not find Carr's allegations of pain and limitations credible: generally unremarkable exam and diagnostic findings despite frequent emergency room visits; provider-observed drug seeking behavior with inconsistent drug testing results; and non-compliance with treatment. See 20 C.F.R. § 404.1529(c) (ALJ considers objective medical evidence, medical opinions, treatment and medication); SSR 96-7p, 1996 WL 374186, at *5, 7 (when assessing credibility, an ALJ considers the consistency of the claimant's own statements and treatment compliance).[2]

Carr argues that her condition "has required in excess of 30 ER and hospital visits with primary symptoms of vomiting and diarrhea." Doc. 14, p. 16. She also identifies areas in the record where she had abnormal diagnostic imaging results. Doc. 14, p. 18. But the ALJ acknowledged that Carr had Crohn's disease, that she had had three surgeries, and that it was a severe impairment. That the ALJ did not find Carr to be as limited by her Crohn's as Carr alleged does not mean that the ALJ erred. And Carr's numerous hospital visits actually cut

---

[2] Carr argues, "The ALJ makes all of Ms. Carr's complaints look as if all she is engaging in is drug seeking behavior." Doc. 14, p. 19. The ALJ did not "make" it look like Carr was engaging in drug seeking behavior. Rather, the ALJ detailed Carr's longitudinal history and recited what Carr's own providers had observed and questioned.

*against* Carr's argument. As the ALJ observed, Carr's treating gastroenterologists informed Carr on multiple occasions that she needed to establish and maintain Crohn's therapy and that repeated visits to emergency rooms were counterproductive in establishing this continual care. Tr. 27, 28. She did not receive Remicade or Humira injections for extended periods of time. Tr. 25, 28. She did not establish care with pain management, as she was advised to do on multiple occasions by multiple providers. See, e.g., Tr. 356, 320, 1302. And her treating physicians suspected that she was abusing emergency room services, given the number of times that she visited, the different locations that she visited, her assessed condition upon arrival, her often negative diagnostic findings, and the prescription pain medication that she had received from multiple sources on a regular basis. Tr. 29, 890, 892, 1302, 328.

Lastly, Carr complains that the ALJ misstated evidence, made inappropriate comments during the hearing, and highlighted, in her decision, irrelevant evidence in the record such as Carr's body piercings, tattoos, and sexual activity. Doc. 14, p. 19-20. The Court disagrees that the ALJ misrepresented evidence or made inappropriate comments during the hearing. The difference between the language found in treatment notes and the ALJ's description of these notes is not material.[3] When read in full, the ALJ's comments at the hearing were not inappropriate. And, while the Court agrees that the ALJ did not need to recite treatment notes detailing Carr's piercings, tattoos and sexual activity, the inclusion of this evidence does not

---

[3] For instance, Carr alleges that the ALJ misquoted an October 18, 2013, treatment note as stating that Carr had said that she was "in the middle of switching doctors" and "had not had anything ... for her Crohn's." Doc. 14, p. 19 (citing Tr. 28). Carr asserts that the treatment note actually reads that Carr stated that she had "not had anything *right now* for her Crohn's." Doc. 14, p. 19 (citing Tr. 962) (emphasis added). Carr contends that the ALJ's omission of the words "right now" "makes Ms. Carr look like she never took any medications for her Crohn's where the complete quote places the proper context." Doc, 14, p. 19. This assertion is without basis. The ALJ discussed the medication that Carr had taken in the past for her Crohn's and accurately noted that Carr stopped treating with Dr. Schirack in September 2013, had numerous emergency room visits, including three different emergency rooms within 12 days, and then began treating with Dr. Mir, who started Carr on Humira for her Crohn's disease in January 2014. Dr. Schirack's office attempted to start Carr on Humira in September 2013, but Carr stopped seeing Dr. Schirack at that time and, thus, did not start Humira until four months later. Therefore, it is accurate to say that Carr was not taking medication for her Crohn's in October 2013 when she stated to an emergency room provider that she had not "had anything" for her Crohn's.

undermine the ALJ's decision, which is based on substantial evidence and is sufficiently explained.  *See Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003) (A court "defer[s] to an agency's decision 'even if there is substantial evidence in the record that would have supported an opposite conclusion, so long as substantial evidence supports the conclusion reached by the ALJ.'").

## VII. Conclusion

For the reasons state above, the Commissioner's decision is **AFFIRMED**.

Dated: June 28, 2017

Kathleen B. Burke
United States Magistrate Judge